# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Facebook, 1601 Willow Road, Menlo Park, CA 94025,<br>re. Facebook ID Number 100011745573374 | )<br>)<br>)  Case No.   21MJ0157<br>)<br>)<br>) |

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. s. 841, 846 | Poss. of a Controlled Substance with Intent to Distribute and Conspiracy to Commit Same |

The application is based on these facts:

See Attached Affidavit of DEA Task Force Officer Jake Sanchez

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jake Sanchez, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: 01/15/2021

*Judge's signature*

City and state: San Diego, California    Hon. Allison H. Goddard, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Task Force Officer Jacob Sanchez, upon being duly sworn do hereby state that the following is true to my knowledge and belief:

1. This affidavit is offered in support of an application by the United States of America for a search warrant in furtherance of an investigation by Homeland Security Investigations for electronic files maintained by Facebook, Inc. in particular for a search warrant to search Facebook accounts as described in Attachment A (incorporated herein):

a. "Khalid Jabro", Facebook ID Number 100011745573374; Username: Jr Jabro ("**Target Account**");

2. The affidavit seeks items as described in Attachment B (incorporated herein) which I believe will constitute evidence and instrumentalities of violations of federal criminal law, namely 21 U.S.C. §§ 841 and 846 (Possession of a Controlled Substance with the Intent to Distribute and Conspiracy to Commit Same) from January 17, 2020 to June 17, 2020.

3. This affidavit is based upon information I have gained through training and experience, as well as upon information related to me by other individuals, including law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known concerning this investigation but have set forth only the facts that I believe are necessary to establish probable cause.

## TRAINING AND EXPERIENCE

4. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am a Task Force Officer with the

United States Drug Enforcement Administration ("DEA"), I have been employed in my current position with DEA since February 2017. I am currently assigned to the San Diego Field Division – Narcotic Task Force. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. During my time as Task Force Officer ("TFO") with the Drug Enforcement Administration, I participated in numerous narcotics investigations, primarily major narcotic trafficking organizations operating in and around the San Diego County area. These investigations and arrests involved: unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics including, but not limited to, methamphetamine, marijuana, cocaine, heroin, and methylenedioxymethamphetamine (commonly referred to as "MDMA"); the laundering of narcotics proceeds and monetary instruments derived from narcotics activities; and conspiracies associated with narcotics offenses. These investigations have involved debriefing defendants, witnesses and informants, conducting surveillance, assisting in court ordered interceptions, including wiretaps, executing search warrants, seizing narcotics and narcotics-related assets and making arrests for narcotics-related offenses.

5.   I have worked and consulted with numerous agents and other law enforcement officers who have investigated drug distribution and trafficking throughout the United States. I have conducted investigations and/or participated in investigations (including several federal wiretap investigations) related to the unlawful importation and distribution of controlled substances as well as the laundering of monetary instruments involving the proceeds of specified unlawful activities associated with criminal drug offenses. From my training, experience, and knowledge of this investigation, I have become familiar with the techniques and methods used by large Mexico-based illegal drug trafficking organizations to

smuggle, transport, and distribute illegal drugs, as well as methods used to collect, smuggle, and launder illegal drug proceeds. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and tablets, to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, maps and directions, and phone numbers of co-conspirators

6. Based upon my training and experience as a DEA TFO, and my consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

a. Drug traffickers will use social networking and messaging services on different electronic devices because it allows access to send instant messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages;

b. Drug traffickers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

c. Drug traffickers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine the locations of their illegal narcotics;

Page 3

   d. Drug traffickers will use social networking and messaging services to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

   e. Drug traffickers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

   f. The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

## BACKGROUND REGARDING FACEBOOK

  7. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

  8. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

  9. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A

Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

10. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

11. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages,

attachments, and links that will typically be visible to anyone who can view the user's profile.

12. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that has that user tagged in them.

13. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

14. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

15. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

16. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

17. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

18. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

19. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

20. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

21. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

22. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following

information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

23. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

24. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

25. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and

information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

26. On May 8, 2020 at approximately 11:15 a.m., Jessica CARLSON was stopped by San Diego Sheriff's Deputies for a violation of the California Vehicle Code. During the traffic stop, Deputies learned that CARLSON was on parole with 4th amendment waiver conditions. Sheriff's Deputies asked CARLSON if there was anything illegal in the vehicle, to which CARLSON stated there was methamphetamine. Deputies searched the vehicle and located approximately 370 grams of methamphetamine concealed within her purse. CARLSON was placed under arrest for possession of methamphetamine for the purpose of sales.

27. While at the Sheriff's Station, Sheriff's Deputies determined CARLSON's home address, and the address she had registered to her as part of her parole conditions, to be 12204 Millar Anita Lane, Spring Valley, CA, 91978. Sheriff's Deputies conducted a parole search of the residence and contacted CARLSON's significant other, Khalid JABRO.

28. While conducting a parole search of the residence, Sheriff's Deputies located approximately 51.3 grams of methamphetamine in the garage. The methamphetamine was directly next to JABRO's keys. JABRO's mother, who also lived at the residence, confirmed that those keys were JABRO's. Sheriff's Deputies also used the keys to open the vehicle in the driveway that JABRO's mother said belonged to him.

29. On June 15, 2020, United States Magistrate Judge Andrew G. Schopler authorized a Complaint and arrest warrants for both CARLSON and JABRO. *See* 20-cr-2066-CAB. JABRO was arrested on the warrant on June 17,

2020. On June 23, 2020, TFOs arrested CARLSON as she arrived at her parole hearing.

30. In an interview with DEA TFO's, CARLSON elected to waive her *Miranda* rights and make a statement. CARLSON said she did in fact possess the methamphetamine and it was for her boyfriend (JABRO). CARLSON granted permission to search the contents of her cellular phone.

31. Based on a review of the contents of CARLSON's cellular phone, CARLSON primarily communicated via Facebook. She conducted narcotic sales and distribution activity using her Facebook account. Facebook messages showed what appear to be drug transactions between CARLSON and other co-conspirators.

32. DEA agents conducted a forensic analysis of CARLSON's cell phone. The phone contained messages from Facebook Messenger between CARLSON and JABRO **(the Target Account)**.

33. During a review of CARLSON's cell phone, the case agent located several Facebook messages between CARLSON and JABRO indicating they were both involved in trafficking narcotics. For example, on April 27, 2020, CARLSON messaged JABRO using Facebook Messenger, "so now that lauren's gtg clean and showing off her new house to u-all is suppsed to stop now right? Or is ur guys relationshiop more than biznis and drugs?" During a separate message, CARLSON messages JABRO, "I need to cover this order and already got sum from my aunt's ppl. I'm going to first ppl now and I'm prolyl gtg pressured into sumthing. Plz send cash so I can at least cover the two." JABRO and CARLSON continue to send messages asking to send money to CARLSON's location, which based on a picture message sent, she was in Mexico. CARLSON continued, "450 for another whole, coming back with two plus then." JABRO responded, "I thought you were getting the two for 18. So your going to get another one on top of

that. Tell me what u want me to do." CARLSON responded, "Just send something over 4 But asap having to follow this guy all over. Seems like a fucking prick." JABRO continued, "Don't u need me to drive you across." JABRO and CARLSON continued to exchange Facebook messages. Based on my training, experience, and knowledge of the investigation, I believe CARLSON and JABRO were using Facebook Messenger to discuss the smuggling of narcotics from Mexico into the United States. Specifically, CARLSON asked JABRO discussed prices for in excess of two pounds of methamphetamine and then discussed CARLSON's need to cross the methamphetamine into the United States.

34. Based upon my experience and investigation in this case, I believe that JABRO, as well as other persons as yet unknown, were involved in an on-going conspiracy to sell methamphetamine or some other federally controlled substances. Based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that co-conspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via Facebook (or other form of communication) after his or her arrest to determine the whereabouts of drugs that are being transported. I therefore believe the communications between JABRO and other coconspirators on or around the date of JABRO's arrest will be captured on the **Target Account**. I believe that the appropriate date range for the search, in which there is probable

cause to find evidence of a crime in the **Target Account,** is from January 17, 2020 up to and including June 17, 2020 (*i.e.*, the date of JABRO's arrest in this case).

### PRIOR ATTEMPTS TO OBTAIN DATA

35. Beyond what is listed above, the United States has not attempted to obtain this data by other means not listed above.

36. Specifically, while the United States has been able to view the Facebook Messenger service linked to the **Target Account** through CARLSON's cell phone, investigators cannot view the full **Target Account** linked to JABRO. In my training and experience, a warrant return is likely to provide more information than just what is viewable on the cell phone.

### GENUINE RISKS OF DESTRUCTION

37. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

### PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

38. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

39. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs and any other content from the Facebook accounts, as described in Attachment A.

In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachments B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

40. Analyzing the data to be provided by Facebook requires special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

41. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of

1  receipt of the data from the service provider, absent further application to this
2  court.
3      42.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages/comments/entries that identify any users of the subject account(s) and any electronic communications sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

   43.   All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

# CONCLUSION

44. Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, §§ 841 & 846 will be found at the premises to be searched as provided in Attachment A.

_____
Jacob Sanchez, Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 15th day of January, 2021.

_____
HON. ALLISON H. GODDARD
United States Magistrate Judge

## ATTACHMENT A

This warrant applies to information following Facebook account associated with the following account:

    a.    "Khalid Jabro", Facebook ID Number: 100011745573374, Username: Jr Jabro ("**Target Account**");

That is stored at premises owned, maintained, controlled, or operated by Facebook LLC, Security Department- Custodian of Records, located at 1601 Willow Road, Menlo Park, CA 94025.

# ATTACHMENT B

I.   <u>Service of Warrant</u>

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files relevant to Attachment A, incorporated herein, and copy them onto removable electronic storage media and deliver the same to the officer or agent in the manner set forth in the Affidavit, incorporated herein.

II.  <u>Information to be disclosed by Facebook</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

   a. All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

   b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

   c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

   d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend"

  requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

III. <u>Information to be seized by the government</u>

  The search of the data supplied by Facebook pursuant to this warrant will be conducted by DEA as provided in the "Procedures For Electronically Stored Information" of the Affidavit submitted in support of this search warrant and will be limited to the period of January 17, 2020 up to and including June 17, 2020, and to the seizure of communications, records, and attachments:

a. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to distribute controlled substances;

b. tending to identify co-conspirators, criminal associates, or others involved in distribution of controlled substances;

c. tending to identify travel to or presence at locations involved in the distribution of controlled substances, such as, but not limited to, stash houses, load houses, or delivery points;

d. tending to discuss or establish distribution of controlled substances, or conspiracies or agreements to do so;

e. tending to discuss or establish the locations of narcotics being distributed;

f. tending to identify the user of, or persons with control over or access to, the subject account; or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

which are evidence of violations of Title 21, United States Code, Section 841 & 846, Possession of a Controlled Substance with Intent to Distribute, and Conspiracy to Commit Same.